206 N.J. Super. 432 (1985)
502 A.2d 1198
BUNG'S BAR & GRILLE, INC., A NEW JERSEY CORPORATION, MAGANLALK AND VILMA SUTARIA, HIS WIFE, KATHERINE DEMPSKY, ANTHONY DRANGULA AND MARGARET DRANGULA, HIS WIFE, R. LOUIS GALLAGHER, INC., A NEW JERSEY CORPORATION, T & T MADERICH, JOHN KISH AND GRACE KISH, HIS WIFE, JOHN PINTO, JR., ROBERT MANGUS AND PHYLLIS MANGUS, HIS WIFE, AND RICHARD HORNER AND CONSTANCE HORNER, HIS WIFE, PLAINTIFFS
v.
THE TOWNSHIP COUNCIL OF THE TOWNSHIP OF FLORENCE AND THE TOWNSHIP OF FLORENCE, DEFENDANTS.
Superior Court of New Jersey, Law Division Burlington County.
Decided March 20, 1985.
*437 Frederick W. Hardt for plaintiffs (Sever & Hardt, attorneys).
Adele C. Baker for defendants (Parker, McCay & Criscuolo, attorneys).
*438 HAINES, A.J.S.C.
This opinion addresses the plaintiffs' request for an allowance of counsel fees and costs incurred in the course of a successful challenge to local improvement assessments. The right to recover turns upon the applicability of 42 U.S.C.A. ง 1983, the federal Civil Rights Act ("Act"), when that Act, though pleaded, was not the basis of plaintiffs' success and therefore was not addressed by this court when it decided that the plaintiffs should be granted injunctive and declaratory relief.
Florence Township adopted a local improvement ordinance appropriating $263,000 for the construction of water and sewer improvements and providing for the assessment of the improvement cost against the lands owned by the plaintiffs and others. The project was completed on October 31, 1977, when the Township Clerk, at the direction of the Township Council, certified its costs to the Assessment Commission created for the purpose of making the required assessments. The Commission, relying upon the opinion of its appraisal expert, allocated the cost of the project among the improved properties and reported its conclusion to the Council for certification. The Council, after reviewing the report at the public hearing, remanded the matter to the Commission for reconsideration because the total assessment exceeded the amount appropriated by the improvement ordinance. The Commission conducted six hearings, at which it received testimony from its own expert and from numerous experts employed by plaintiffs. Its final report, dated July 14, 1980, reflected the figures advanced in the opinion of its witness. On November 5, 1980, the Township Council, after a public hearing, confirmed the Commission's assessments.
This suit challenging the assessments on statutory and constitutional grounds was commenced on November 21, 1980. Tax bills covering the assessments were mailed to property owners on December 15, 1980. On December 22, 1980 this *439 court stayed the imposition of tax liens on plaintiffs' properties and, on January 22, 1981, restrained all actions to enforce the assessments. The controversy, except for issues concerning damages, costs and attorneys fees, was submitted for decision on the record of the Township proceedings, briefs and oral argument.
This court, for various reasons, set aside all of the Township's assessments and reassessed the properties, primarily on the basis of the testimony presented by the plaintiffs' experts. In doing so, the court relied upon N.J.S.A. 40:56-54, et seq., providing for appeals from assessments for local improvements, and upon McNally v. Teaneck, 132 N.J. Super. 442 (Law Div. 1975), mod. 75 N.J. 33 (1977). The court's opinion did not address specifically the claims made by plaintiffs under the Civil Rights Act. Its decision was affirmed on appeal by the Appellate Division; certification was denied by the Supreme Court. Plaintiffs now move for summary judgment allowing counsel fees and costs. They agree to waive their damage claims if reasonable allowances are made for these items. Requested cost allowances include fees paid by plaintiffs to their expert witnesses and the expense of transcribing the municipal hearings. Disposition of the motion is not impeded by formal disputes. This opinion decides all remaining issues.

A. 42 U.S.C.A. งง 1983 & 1988

New Jersey Court Rule 4:42-9(a)(8) permits the allowance of fees for legal services "in all cases where counsel fees are permitted by statute." The statute upon which plaintiffs rely in their request for fees is 42 U.S.C.A. ง 1988, which provides:
In any action ... to enforce ... section[s] 1983... the court, in its discretion, may allow the prevailing party ... a reasonable attorney fee as part of the costs.
Section 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State... subjects or causes to be subjected, any citizen of the *440 United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
It is this section of the Civil Rights Act upon which plaintiffs relied in part in the underlying litigation. Together with Section 1988, it plays a central role in the present application. Section 1983 is enforceable in the state courts. Endress v. Brookdale, 144 N.J. Super. 109 (App.Div. 1976). So is ง 1988, which, "like all federal law, is fully applicable to state court proceedings by virtue of the Supremacy Clause, U.S.Const., Art. VI cl. 2." Ramirez v. Hudson Cty., 169 N.J. Super. 455, 457 (Ch.Div. 1979).

B. The Constitutional Issue

Plaintiffs can recover attorneys' fees only by showing that a federal constitutional violation occurred. That is the basis of their civil rights claims. It is necessary, therefore, to identify the constitutional provision that supports those claims.
All Federal courts apparently determine the validity of local assessments through application of the due process clause of the Fourteenth Amendment. State courts do the same or apply like provisions of state constitutions. The decisions, however, speak in terms of "police powers" and "taxation" when dealing with the question of power to assess and in terms of "due process," "taking without just compensation" and "equal protection" when dealing with restrictions on that power, making their interpretation of the Fourteenth Amendment unclear. New Jersey's leading case, McNally v. Teaneck, 75 N.J. 33 (1977), rejects both taxation as a basis for assessment and equal protection as a concern. Most United States Supreme Court decisions may be so read; a number, however, find equal protection violations and there are frequent references to the power of taxation. Seemingly, those references are no more than alternative descriptions of the power to assess for local improvements. Many cases, state and federal, refer to takings without just compensation, the language of eminent domain. *441 Some correctly recognize police power as providing assessment authority limited by the Fourteenth Amendment.
The power of eminent domain is the power to take private property for public use. In the case of the Federal Government it has been described as an "inherent `attribute of sovereignty'" and the "offspring of political necessity." Tribe, American Constitutional Law 254 (1978). New Jersey relies upon a like philosophy. Valentine v. Lamont, 13 N.J. 569 (1953). The Federal Government is restricted in its exercise of this power by the Fifth Amendment, which provides:
No person shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.
Thus, there can be no Federal taking without "just compensation." The New Jersey Constitution (1947), Art. I par. 20, is to the same effect.
The Fifth Amendment "just compensation" clause has not been applied to the states by the Fourteenth Amendment. J. Nowak, R. Rotunda & J.N. Young, Constitutional Law, 377 (1978) [hereinafter cited as Nowak]. However, the due process clause of the Fourteenth Amendment, first thought to require only procedural due process, Davidson v. New Orleans, 96 U.S. (6 Otto) 97, 24 L.Ed. 616 (1877), was soon interpreted to regulate substance as well as requiring a taking of private property only for a public use and only when just compensation is paid. Chicago, B. & Q.R. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). In effect, therefore, state and Federal governments are subject to the same rule in eminent domain cases though by reason of different federal amendments. Nowak, supra, comments on Chicago:
Although some cases and commentators have viewed [this decision] as incorporating the compensation clause into the Fourteenth Amendment, this view does not appear strictly correct. Rather the Court appears to have found independent public use and just compensation requirements in the definition of due process. [at 440.]
These "taking" and "just compensation" concepts are reflected in the local assessment decisions although such assessments, as *442 will be shown, involve neither "takings" nor "just compensation."
Police power, the true basis of local assessments, is an inherent power of state, but not Federal, government. The Federal Government is one of enumerated powers. Nowak, supra, 112. The police power authorizes the adoption and enforcement of laws promoting the public health, safety, welfare and morals. Two Guys from Harrison v. Furman, 58 N.J. Super. 313 (1959), rev'd. on other grds., 32 N.J. 199 (1960). It is not restricted in the manner our Constitutions restrict the power of eminent domain. On some occasions, e.g., to protect the public safety, property may be taken without compensation. Rothman v. Rothman, 65 N.J. 219 (1974); Spagnuola v. Bonnet, 16 N.J. 546 (1954). Nevertheless, the police power is limited by the due process clause of the Fourteenth Amendment, which is violated when its exercise is arbitrary. Roselle v. Wright, 21 N.J. 400 (1956).
The Fourteenth Amendment provides that:
No state shall ... deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
The language of this due process clause is similar to that of the Fifth Amendment. Both clauses have been held to have the same meaning. Hurtado v. California, 110 U.S. 516, 534-35, 4 S.Ct. 111, 120, 28 L.Ed. 232 (1884). The fact that the Fourteenth Amendment has not applied the Fifth Amendment due process clause to the states is therefore immaterial. What is material here is that the Fourteenth Amendment applies to State exercise of the police power, preventing its arbitrary use in local assessment cases.

C. Norwood v. Baker

Norwood v. Baker, 172 U.S. 269, 19 S.Ct. 187, 43 L.Ed. 443 (1898), is the significant early federal case applying the Fourteenth Amendment to a local assessment. It is best described as a "target" rather than a "leading" case, since it has been cited and distinguished by nearly every subsequent United *443 States Supreme Court local assessment decision. It was, however, relied upon in the New Jersey case of McNally v. Teaneck. Norwood involved a street construction ordinance pursuant to which property was condemned and assessments for benefits were levied. The assessments covered all of the costs of condemnation including compensation paid for the takings. No inquiry into the value of the benefits conferred was permitted. The Court held that the assessments represented "an exercise of the power of taxation," that the Fourteenth Amendment required "compensation to be made or secured to the owner when private property is taken by a state, or under its authority, for public use." [Norwood, supra, 172 U.S. at 277.] Then, blending these concepts, it said:
In our judgment, the exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him, is, to the extent of such excess, a taking under the guise of taxation, of private property for public use without compensation. [Id. at 279, 19 S.Ct. at 191.]
Norwood therefore recognized the Fourteenth Amendment due process clause as the controlling constitutional proviso. It suggested that the tax power was used to disguise a taking which required the payment of compensation.
It is here that the difficulty begins. While all courts agree that an assessment substantially in excess of benefits is wrong and many talk in the "taking just compensation" language of Norwood, the fact is that neither "taking" nor "just compensation" is involved. The excess assessment, designed to recover the value of benefits conferred, "takes" nothing. Courts do not require the payment of compensation when an assessment is proved to be excessive. There is no basis, no reason for such payment. The assessment is simply set aside or its collection restrained.

D. The United States Supreme Court Decisions After Norwood

Norwood invited a flood of local assessment cases in the Supreme Court. Eleven were decided in 1901. Most distinguished *444 Norwood. All recognized the constitutional requirement that local assessments must be roughly equivalent to conferred benefits. None made clear the basis of the power to assess or the constitutional provisions which limited that power. Most were concerned about judicial interference with the exercise of legislative determinations concerning assessments for benefits. A brief analysis of a substantial sampling of these cases illustrates the varied approaches to the constitutional problem.
(1) French v. Barber Asphalt Paving Co., 181 U.S. 324, 21 S.Ct. 625, 45 L.Ed. 879 (1901), was a street paving case in which assessments were made against abutting lots on the basis of frontage. It is the decision most frequently cited after Norwood. The court said the authority to charge the expense of local improvements to properties specially benefited was included within the taxing power. Id. at 344, 21 S.Ct. at 632. It held that a legislative determination as to what lands are benefited by a local improvement is conclusive upon the courts, a holding echoed with considerable consistency by most subsequent United States Supreme Court cases. In reaching this conclusion the court quoted the following passage from Spencer v. Merchant, 125 U.S. 345, 8 S.Ct. 921, 31 L.Ed. 763 (1888) with approval:
But the legislature has the power to determine by the statute imposing the tax what lands which might be benefited by the improvement are, in fact, benefited and if it does so, its determination is conclusive upon the owners and the courts, and the owners have no right to be heard upon the question whether their lands are benefited or not, but only upon the validity of the assessment and its apportionment among the different parcels of the class which the legislature has conclusively determined to be benefited. [181 U.S. at 339, 21 S.Ct. at 630.]

French upheld the assessment. It distinguished Norwood saying that the assessment practice there:
appeared, both to the court below and to the majority of the judges of this court, to be an abuse of the law, an act of confiscation, and not a valid exercise of the taxing power.
....
[The village still had the power] to make a new assessment upon the plaintiff's abutting property for so much of the expense of opening of the street as was found upon due and proper inquiry to be equal to the special benefits accruing to the property. [French, 181 U.S. at 344, 21 S.Ct. at 632.]

French, therefore, recognized the basic assessment-benefit principle while establishing the strong presumption that the legislative decision as to benefits is correct. This presumption, as we shall see later, is contrary to the law of New Jersey.

*445 (2) Cass Farm Co. v. Detroit, 181 U.S. 396, 21 S.Ct. 644, 45 L.Ed. 914 (1901), is another street paving case, decided on the same day as French, upon which it relied. It said:
the Federal courts ought not to interfere when what is complained of is the enforcement of the settled laws of the state applicable to all persons in like circumstances and conditions, but only when there is some abusive law amounting to confiscation of property or deprivation of personal rights, as was instanced in the case of Norwood v. Baker. [at 398, 21 S.Ct. at 645.]
(3) Wight v. Davidson, 181 U.S. 371, 21 S.Ct. 616, 45 L.Ed. 900 (1901), decided on the same day as French, found a District of Columbia assessment for street construction to be constitutional. Norwood v. Baker was distinguished. The distinguishing language is significant:
There the question was as to the validity of a village ordinance which imposed the entire cost and expenses of opening a street, irrespective of the question whether the property was benefited by the opening of the street. The legislature of the state had not defined or designated the abutting property as benefited by the improvement, nor had the village authorities made any inquiry into the question of benefits. There having been no legislative determination as to what lands were benefited, no inquiry instituted by the village councils, and no opportunity afforded to the abutting owner to be heard on that subject, this court held that the exaction from the owner of private property of the cost of the public improvement in substantial excess of the special benefits accruing to him is, to the extent of such excess, a taking, under the guise of taxation, of private property for public use, without compensation, and accordingly affirmed the decree of the circuit court....
....
... Special facts showing, an abuse or disregard of the law, resulting in an actual deprivation of property, may give grounds for applying for relief to a court of equity; and this was thought by a majority of this court to have been the case in Norwood v. Baker. [181 U.S. at 384-85, 21 S.Ct. at 621-22.]
(4) The eight additional cases decided in 1901 followed the French doctrine, and provide no additional constitutional insights. They are: (a) Lombard v. W. Chicago Park Comm'rs., 181 U.S. 33, 21 S.Ct. 507, 45 L.Ed. 731 (1901); (b) Tonawanda v. Lyon, 181 U.S. 389, 21 S.Ct. 609, 45 L.Ed. 908 (1901); (c) Webster v. Fargo, 181 U.S. 394, 21 S.Ct. 623, 45 L.Ed. 912 (1901); (d) Detroit v. Parker, 181 U.S. 399, 21 S.Ct. 624, 45 L.Ed. 917 (1901); (e) Allen v. Dist. of Columbia, 181 U.S. 402, 21 S.Ct. 609, 45 L.Ed. 921 (1901); (f) Shumate v. Heman, 181 U.S. 402, 21 S.Ct. 645, 45 L.Ed. 922 (1901); (g) Wormley v. Dist. of Columbia, 181 U.S. 402, 21 S.Ct. 609, 45 L.Ed. 921 (1901) and (h) Farrell v. Chicago Park Comm., 181 U.S. 404, 21 S.Ct. 609, 45 L.Ed. 924 (1901).
(5) Chesebro v. Los Angeles County Flood Control Dist., 306 U.S. 459, 59 S.Ct. 622, 83 L.Ed. 921 (1939), is the last local assessment case decided by the United States Supreme Court. It cited and followed French, but held that a hearing as to benefits was necessary when the Legislature itself did not fix *446 benefits. It also said that the legislative determination of benefits was "conclusive" Id. at 464, 59 S.Ct. at 624.
A few cases asserted "palpably arbitrary", "wholly unequal" and "plain abuse" standards as bases for Fourteenth Amendment relief:
(a) Houck v. Little River Drainage District, 239 U.S. 254, 36 S.Ct. 58, 60 L.Ed. 266 (1915), considered an assessment in connection with the establishment of a drainage district. The court held that the legislative action in fixing "the basis of taxation or assessment ... cannot be assailed under the Fourteenth Amendment unless it is palpably arbitrary and a plain abuse." Id. at 262, 36 S.Ct. at 60. It continued:
Unless the exaction is a flagrant abuse, and by reason of its arbitrary character is mere confiscation of particular property, it cannot be maintained that the state has exceeded its taxing power. [at 266, 36 S.Ct. at 62.]
(b) Roberts v. Richland Irr. Dist., 289 U.S. 71, 53 S.Ct. 519, 77 L.Ed. 1038 (1933), recognized the rule that "the action of such a district in apportioning the burden of taxation cannot be assailed under the 14th Amendment unless palpably arbitrary and a plain abuse." Id. at 74-75, 53 S.Ct. at 520.
(c) Goldsmith v. George G. Prendergast Const. Co., 252 U.S. 12, 40 S.Ct. 273, 64 L.Ed. 427 (1920), held:
this court only interfaces with such assessments on the ground of violation of constitutional rights secured by the Fourteenth Amendment, when the action of the state authorities is found to be arbitrary, or wholly unequal in operation and effect. [at 17-18, 40 S.Ct. at 274.]
Several decisions invalidated assessments:
(i) Martin v. Dist. of Columbia, 205 U.S. 135, 27 S.Ct. 440, 51 L.Ed. 743 (1907), considered and quashed assessments for benefits supposedly conferred as the result of widening an alley in the District of Columbia. The Court said "that in any event, the apportionment is to be limited to the benefit, and if it is so limited, all serious data as to the validity of the statute disappears." Id. at 140, 27 S.Ct. at 442. Assessments, in fact, were not limited to benefits.
(ii) Myles Salt Co. v. Bd. of Comm'rs., 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392 (1916), dealt with an assessment of an island property located in a drainage district but 175 feet above surrounding properties. It did not benefit from the drainage plan in any way. The court held that when a drainage district "is so formed to include property which is not and cannot be benefited directly or indirectly, including it [sic] only that it may pay for the benefit of other property, there is an abuse of power and an act of confiscation." Id. at 485, 36 S.Ct. at 206. The Court reversed a decree that refused to restrain the sale of the island for failure to pay the assessment.
(iii) Gast Realty & Inv. Co. v. Schneider Granite Co., 240 U.S. 55, 36 S.Ct. 254, 60 L.Ed. 523 (1916), involved a street paving ordinance that established an arbitrary boundary line for the purpose of assessment. The court set the assessments aside, finding them to be arbitrary because differences in benefits were not considered. The court said:

*447 [I]f the law is of such a character that there is no reasonable presumption that substantial justice generally will be done, but the probability is that the parties will be taxed disproportionately to each other and the benefit conferred, the law cannot stand against the complaint of one so taxed in fact. [at 58, 36 S.Ct. at 254.]
(iv) Kansas City So. Ry. Co. v. Road Improvement Dist., 256 U.S. 658, 41 S.Ct. 604, 65 L.Ed. 1151 (1921), reversed a judgment sustaining an assessment of railroad property. The court found "discrimination so palpable and arbitrary as to amount to a denial of the equal protection of law." Id. at 661, 41 S.Ct. at 605. The court noted that "ordinarily the levy may be upon lands specially benefited according to value, position, area, or the front foot rule." Id. at 660, 41 S.Ct. at 605.
(v) Nashville, C. & St. L. Ry. v. Walters, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949 (1935), involved the assessment of the cost of eliminating a grade crossing. The court noted that there was authority to make the assessment under the police power of the state, but said that "the police power is subject to the constitutional limitation that it may not be exerted arbitrarily or unreasonably." Id. at 415, 55 S.Ct. at 488; emphasis supplied. The assessment was set aside, the court saying:
While moneys raised by general taxation may constitutionally be applied to purposes from which the individual taxed may receive no benefit, and indeed, suffer serious detriment; so called assessments for public improvements laid upon particular property owners are ordinarily constitutional only if based on benefits received by them. [at 429-30, 55 S.Ct. at 495; citations omitted.]
(vi) Road Imp. Dist. #1 of Franklin Co. Ark. v. Missouri Pac. Ry. Co., 274 U.S. 188, 47 S.Ct. 563, 71 L.Ed. 992 (1927), held that an arbitrary and discriminatory assessment violated due process and equal protection. An injunction was allowed.
(vii) In Georgia Ry. & Elec. Co. v. City of Decatur, 295 U.S. 165, 55 S.Ct. 701, 79 L.Ed. 1365 (1935), the Court, in response to an argument that the police power permitted an assessment without regard to benefit, said:
if the burden imposed is without any compensating advantage ..., the arbitrary abuse of the power exercised is plain ...; the assessment amounts to confiscation. [at 170, 55 S.Ct. at 703.]
Those United States Supreme Court decisions distinguished, but did not reverse, Norwood. The basic premise, that assessments and benefits must be in reasonable balance, remains intact. At most, the cases simply established a presumption that the test is satisfied by state legislative action which is not clearly arbitrary.
New Jersey does not recognize the presumption. Our cases hold that assessments cannot exceed benefits as a matter of constitutional demand regardless of how the assessments are *448 made. Alternatively, they may be holding that our Legislature does not have the power to assess beyond benefits, thus denying any opportunity for a presumption to arise. McNally v. Teaneck, for example, cited Norwood but none of the subsequent United States Supreme Court cases that established the presumption, apparently finding them inapplicable in a New Jersey assessment dispute. Nevertheless, the constitutional provision upon which our decisions turn is not clear.

E. New Jersey's Local Assessment Cases

The Tide-water Co. v. Coster, 18 N.J. Eq. 518 (E. & A. 1866), is one of New Jersey's earliest cases dealing with local assessments. It was decided two years before the Fourteenth Amendment was adopted, but was nevertheless cited in Norwood v. Baker, a decision based upon that amendment. Tide-water held:
Where lands are improved by legislative action, on the ground of public utility, the cost of such improvement, it has been frequently held, may, to a certain degree, be imposed on the parties who, in consequence of owning lands in the vicinity of such improvement, receive a peculiar advantage. By the operation of such a system, it is not considered that the property of the individual or any part of it is taken from him for the public use, because he is compensated in the enhanced value of such property. But it is clear this principle is only applicable when the benefit is commensurate to the burthen; when that which is received by the land owner is equal or superior in value to the sum exacted; for if the sum exacted be in excess, then to that extent, most incontestably, private property is assumed by the public. Nor, as to this excess, can it be successfully maintained that such imposition is legitimate as an exercise of the power of taxation. Such an imposition has none of the essential characteristices of of a tax. [at 527.]
....
If the assessment to which he is subjected had been restricted so as not to exceed the benefits received by him, he would have run no risk, because he could not have suffered any loss; but as this law is framed, his land may be taken from him, if the expenses of the project require the sacrifice. This, as has been already stated, would be, in my opinion, equivalent to a condemnation of the land, without compensation, for the public benefit, and as this may result from the natural operation of the statute, I am compelled to conclude that it is unconstitutional and void. [at 529.]
*449 There can be no quarrel with these conclusions. They are rational and thorough. The declaration that the statute was "void" follows the usual course when a statute has been held to violate substantive due process. Compensation was not a consideration. The use of the words "equivalent to a condemnation of the land without compensation," however may have been unfortunate, since they preceded a quotation from a New York case, which read: "If the assessment is confirmed and enforced, the owners of the adjacent property must pay beyond the enhanced value of their own property, and all such excess is private property taken for public use without just compensation." Id. at 529. This language may have spawned the references to "taking" and "just compensation," which appears in later cases. Three such cases, all involving local assessments (the first two of which cited Tide-water) are: Hoboken Land and Improvement Co. v. Hoboken, 36 N.J.L. 291, 293 (Sup.Ct. 1873); Agens v. Newark, 37 N.J.L. 415, 421-23 (E. & A. 1874); Bogert v. Elizabeth, 27 N.J. Eq. 568 (E. & A. 1876). McNally v. Teaneck, the latest New Jersey Supreme Court case involving local assessments, used the same language; it also cited Tide-water, 75 N.J. at 43.
The Tide-water opinion did not identify the constitutional provision upon which it relied by any specific reference. It could not have been referring to the Federal Constitution since the Fourteenth Amendment had not yet been adopted and the just compensation clause of the Fifth Amendment applied only to federal action. New Jersey's Constitution of 1844, Art. I, par. 16, was then in force and provided: "Private property shall not be taken for public use, without just compensation...." This seems to be the obvious clause to which Tide-water referred. It could, however, anticipating Chicago, B. & Q.R. v. Chicago, have relied upon Art. I, par. 1, which then provided, in language almost identical to that which appears in our 1947 Constitution:
All men are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and *450 liberty, acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
These provisions are to be employed in the same sense as the due process clause of the Fourteenth Amendment. State Bd. of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504, 518 (E. & A. 1935). In Chicago, B. & Q.R., the Fourteenth Amendment was held to permit a taking of private property only for a public use and only if compensation is paid.
It was suggested in State, Society for Establishing Useful Manufactures v. Paterson, 42 N.J.L. 615 (E. & A. 1880), that New Jersey has no specific constitutional provision providing the power to make local assessment:
But still the question presses, are these assessments to be treated and regulated by the same rules that confine and trammel legislation in its ordinary uses? And upon full consideration, my conclusion is, that they are not to be so regarded, and that the power in such instances exercised is sui generis. The right of the public to improve a man's property against his will, and to make him pay the expense, calling it a tax, has always seemed to me a kind of procedure very dissimilar from ordinary acts of legislation. But such exercises of authority, however abnormal they may seem when tested by theory, have too long prevailed, both in this state and elsewhere, to be now called in question. The existence of the legislative power, in this province, has been settled by long usage and oft-repeated judicial recognition. And in many instances, and for a long period of time, it has been put in force in the form that is now in this case exclaimed against, for assessments confined to the lands fronting on the improved street are not novelties, but have always been a part of this exceptional system. So likewise, such partial impositions have been, from time to time, at least tacitly assented to by the courts in the state and various assessments made under laws containing this feature have been sustained by this court of last resort. And it is likewise impossible to forget the fact that there is at present much of the legislation of the state largely affecting municipal interests of great magnitude, which has grown up by reason of such apparent judicial sanction. In this state of affairs, it seems to me that the practice now in question must be taken to be a recognized part of that ancient and inveterate plan which has been resorted to in taxing the land-owner for the special benefit that a public improvement of this kind has imparted to his property. Viewing it in this light, it cannot at this late day, be discarded. [at 618-19.]
Following Tide-water, the constitutionality of a local assessment was discussed in Brittin v. Blake, 36 N.J.L. 442 (E. & A. 1872), but no reference was made to either state or Federal Constitution. This was followed by Agens v. Newark, which said that the state constitution does not require uniform taxation *451 among political districts but the "legislative right to select the subject of taxation" is limited. Agens, 37 N.J.L. at 421. The Federal Constitution was not mentioned. Next was New Brunswick Rubber Co. v. Comm'rs. of the City of New Brunswick, 38 N.J.L. 190 (Sup.Ct. 1875), which referred to the "power to tax for the expense of local public improvements, lands peculiarly benefited by such improvements," Id. at 192, and required the establishment of some rule "within constitutional limits, for the apportionment of the tax upon the lands on which such special burthen is imposed." Id. at 193. The constitutional provision was not identified. Bogert v. Elizabeth referred to "constitutional bounds," but did not identify the clause upon which it relied in either the State or Federal Constitutions. Bogert, 27 N.J. Eq. at 569. Baldwin v. Fuller, 39 N.J.L. 576 (Sup.Ct. 1877) aff'd. 40 N.J.L. 615 (E. & A. 1878), suggested that a local assessment was a legitimate exercise of the police power, a power, however, which was restricted so that the assessment could not exceed the benefit conferred. The court held that otherwise there would be a taking of private property for use without just compensation in violation of the New Jersey Constitution. There was no reference to the Federal Constitution. Bogert v. Elizabeth referred to "constitutional bounds," but did not identify the clause upon which it relied in either the State or Federal Constitution. Bogert, 27 N.J. Eq. at 569.
In In re Public Service Elec. & Gas. Co., 18 N.J. Super. 357 (App.Div. 1952), the Court discussed the constitutional issues as follows:
Local assessments or special taxes for the payment of the cost of certain kinds of public improvements commonly prevail and are generally sustained under the exercise of the power of taxation. But they have no relation to the exercise of the power of eminent domain, and hence constitutional provisions respecting this right have no application. They differ also from general taxes, since they are not a tax at all in the constitutional sense or as taxes are generally understood, although it has been said that "assessments for local improvements form an important part of the system of taxation." [at 362-63.]
*452 The court specifically addressed the power question, saying:
The foundation of the power to lay a special assessment or a special tax for a local improvement of any character, whether it be opening, improving or paving a street or sidewalk or constructing a sewer, or cleaning or sprinkling a street, is the benefit which the object of the assessment or tax confers on the owner of the abutting property, or the owners of property in the assessment or special taxation district, which is different from the general benefit which the owners enjoy in common with the other inhabitants or citizens of the municipal corporation. Accordingly, it is now well settled in most jurisdictions that adjacent property may be specially assessed to defray, in whole or in part, the cost of local improvements by which such property is especially benefited. That doctrine, as stated, is based for its final reason on enhancement of values. That is to say, the whole theory of local taxation or assessments is that the improvements for which they are levied afford a remuneration in the way of benefits. Whether the property has been specially benefited by an improvement is generally regarded a question of fact, depending on the circumstances in each case, for the determination of the proper tribunal. The broad question is whether the general value of the property has been enhanced, not whether its present owner receives advantage. [at 363.]
In Jardine v. Rumson, 30 N.J. Super. 509 (App.Div. 1954), the assessment was held to be invalid because the plaintiff's property received no benefit from the improvement. Assessments paid were returned and further collection of assessments was restrained. The court relied upon the just compensation clause of the New Jersey Constitution.
The authoritative and most recent New Jersey decision concerning local assessments is McNally v. Teaneck. The fact that local assessments are not an "exercise of the power of taxation" was recognized in McNally where the Court said: "The special assessment is not a tax which comes within the constitutional provision requiring that property be assessed for taxation under general laws and by uniform rules." McNally, 75 N.J. at 43. Only the State Constitution was cited. However, the Court reversed a lower court decision which relied upon both State and Federal Constitutions, as well as Switz v. Middletown Township, 23 N.J. 580, 621 (1967), a case dealing with general taxation and the requirement, with respect to such taxation, of equal protection. McNally also recognized the police power as the foundation for local assessments, saying: "The ordinance authorized by statute, promulgated under the State's police power, simply created a method of levying assessments *453 on those who have received a special benefit from the expenditure." McNally, 75 N.J. at 44; emphasis supplied. The Court also said: "Exaction of more than the special benefit to the property owner would constitute a taking of private property for public use without compensation," citing both Norwood and Tide-water for this proposition. Id. at 43. McNally did not mention either the State or the Federal Constitution in this connection.

F. Other Comments and Cases on the Difficulty of the Taking-Due Process Analyses.

The difficulties courts have encountered in applying the due process clauses have been discussed by law review commentators. Comment, Testing the Constitutional Validity of Land Use Regulations: Substantive Due Process As a Superior Alternative to Takings Analysis, 57 Wash.L.Rev. 715 (1982) says:
Two clauses of the United States Constitution figure most prominently in the debate over the constitutional limits on the governmental power to regulate land. They are the just compensation clause of the fifth amendment and the due process clause of the fifth and fourteenth amendments. Neither the courts nor the commentators agree, however, on which provision to apply. The courts frequently confuse and blend the distinct concepts of: (1) taking property without payment of just compensation, and (2) depriving a person of property without due process of law. This confusion has resulted in disparate results as well as in conflicting analysis. A particular regulation might be ruled in a "regulatory taking" in one state, struck down as a denial of due process in another, and upheld as a valid police regulation in a third. [at 715; footnotes omitted.]
The article also says:
The theories of substantative due process and eminent domain developed from distinct constitutional provision. Substantive due process requires that governments enact regulations that are reasonable. Eminent domain, on the other hand, prohibits government from acquiring private property without payment. [at 726; footnotes omitted.]
Comment, Balancing Private Loss Against Public Gain to Test for a Violation of Due Process or a Taking Without Just Compensation, 24 Wash.L.Rev. 315 (1979), adds:

*454 However, the courts do not agree on which provision is violated. Some find a violation of the fifth amendment's prohibition against taking private property without compensation, while others find the deprivation of private property without due process of law violating the substantive requirements of due process clause in the fourteenth amendment.
The distinction between these two limitations, which is seldom recognized in judicial opinions, is fundamental. Beginning with the premise that all individuals are expected to yield some property interests without compensation for the good of all, it can be shown that two distinct, complementary limitations on governmental power to take property rights are required. The minimal requirements of substantative due process ensure that all governmental deprivation of property meet certain standards of propriety whether or not compensation is required, and the compensation provision ensures that a property owner will be paid if his burden exceeds that which an individual is expected to yield without compensation. It is important that courts distinguish these limitations because a violation of the compensation requirement is correctable by government payment while an action that is improper for any other reason must be voided. [at 336-37; footnote omitted.]
Some cases dealing with land regulation have recognized the due process-police power rule followed in the present case. Fred F. French Inc. Co. v. New York, 39 N.Y.2d 587, 594-96, 350 N.E.2d 381, 384-86, 385 N.Y.S.2d 5, 8-9, cert. den., 429 U.S. 990, 97 S.Ct. 515, 50 L.Ed.2d 602 (1976), addressed a zoning resolution alleged to have accomplished an "inverse" condemnation. The court said:
The power of the State over private property extends from the regulation of its use under the police power to the actual taking of an easement or all or part of the fee under the eminent domain power.
....
... [I]n Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 [(1922)], a police power and not eminent domain case, Mr. Justice Holmes stated: "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking"....
....
The metaphor should not be confused with the reality. Close examination of the cases reveals that in none of them, any more than in the Pennsylvania Coal case (supra), was there an actual "taking" under the eminent domain power, despite the use of the terms "taking" or "confiscatory". Instead, in each the gravamen of the constitutional challenge to the regulatory measure was that it was an invalid exercise of the police power under the due process *455 clause, and the cases were decided under that rubric.... [350 N.E.2d at 384-85, 385 N.Y.S.2d at 8-9.]
French was criticized in San Diego Gas & Elec. v. City of San Diego, 450 U.S. 621, 648 n. 14, 101 S.Ct. 1287, 1302 n. 14, 67 L.Ed.2d 551, while approved by the California Supreme Court in Agins v. City of Tiburon, 24 Cal.3d 266, 277, 598 P.2d 25, 31, 157 Cal. Rptr. 372, 378 (1979), aff'd. 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). It is cited here to illustrate the taking-due process-police power issue.
In Smoke Rise v. Washington Suburban San. Com'n., 400 F. Supp. 1369 (D.Md. 1975), the court noted that:
The fifth amendment employs two independent clauses to address two independent issues. Contrary to the allegations of the amended complaint, a claim of deprivation of property without due process cannot be blended as one in the same with the claim that property has been taken for public use, without just compensation. [at 1381.]
See also, Rockville Fuel and Feed Co. v. Gaithersburg, 266 Md. 117, 291 A.2d 672 (1972).

G. The Constitutional Conclusion

There is no quarrel with the conclusions reached in any of the New Jersey local assessment cases. All held that assessments must be equivalent to benefits. They voided those which were excessive and the laws which permitted them. They made no awards of compensation though monies paid were returned. They are binding on this court under principles of stare decisis. This opinion merely pinpoints the due process rule, which requires the ultimate conclusion. This rule, distilled from the state and federal cases, may be stated as follows:
Power to levy a local assessment, given to municipalities by statute, is based, not upon the state's power of eminent domain, nor upon its power to tax, but upon its police power. The police power is the power to promote the public health, safety, welfare and morals. Its exercise is premised upon the understanding that the local improvement has conferred a benefit upon the assessed property for which the municipality has a right to be paid. It is the benefit which confers and limits the power. An assessment which exceeds the value of the benefit is arbitrary. It exceeds the limits of the police power and, in the language of the fourteenth amendment, "deprive[s] ... person[s] of ... property without due process of law." This deprivation of property requires the *456 offending action to be set aside. "Just compensation" is not involved; there is no taking of property for which compensation is to be paid.
This rule's reliance on the police power is supported by Georgia Ry. & Elec. Co. v. City of Decatur, 295 U.S. at 170, 55 S.Ct. at 703, Nashville, C. & St. L. Ry. v. Walters, 294 U.S. at 415, 55 S.Ct. at 488 and McNally v. Teaneck. See also, Baldwin v. Fuller, 39 N.J.L. 576. It unifies the approaches used in the various local assessment opinions.
The federal courts probably would add to this rule the presumption that benefits legislatively assessed are presumptively correct and will be sustained unless shown to be arbitrary or confiscatory, although that rule does not seem to have been recognized by Justice Brandeis in Nashville v. C. & St. L. Ry., in which he simply said that assessments must be based upon benefits. Since there is no such presumption in New Jersey and since our Legislature has required all assessments to be "as nearly as may be in proportion to and not in excess of the peculiar benefit, advantage or increase in value which the respective lots and parcels of real estate shall be deemed to receive by reason of such improvement," N.J.S.A. 40:56-27, the presumption would not be available to a federal court reviewing a New Jersey assessment. This is clear from the holding in Chesebro v. Los Angeles Co. Flood Control Dist.:
But where the district was not directly created by the legislature and there has been no determination by it that their property will be benefited by the local improvements โ the owners are entitled, under the due process clause of the Fourteenth Amendment, to be heard by some officer or tribunal empowered by the State to hear them and to consider and decide whether their lands will be specially benefited. [306 U.S. at 464, 59 S.Ct. at 625.]
Furthermore, the federal courts, in a local assessment case, would defer to the decision of the New Jersey Supreme Court in McNally. Georgia Ry. & Elec. Co. v. City of Decatur, 295 U.S. at 170, 55 S.Ct. at 703. The rule to be applied to all New Jersey assessments, therefore, is the rule set forth above.
It does not matter that some New Jersey cases have relied upon the New Jersey Constitution only when addressing local assessment cases. A violation of either the due process or *457 "just compensation" provisions of our Constitution would necessarily be a violation of the due process clause of the Fourteenth Amendment of the Federal Constitution as well. They have the same meaning. The assessments made against the plaintiffs' properties, for example, were contrary to the requirements of the Fourteenth Amendment to the Federal Constitution and of Art. I, par. 1 of the New Jersey Constitution.

H. The Tax Injunction Act

The Township argues that N.J.S.A. 40:56-1 et seq. provided plaintiffs with a "plain, speedy and efficient remedy" in the courts of New Jersey, thereby preventing reliance upon the federal Civil Rights Act in this proceeding for any purpose, including reliance for the purpose of collecting attorneys' fees and costs. The argument turns, primarily, upon the provisions of the Tax Injunction Act, 28 U.S.C.A. ง 1341, which provides:
The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.
Consequently, federal courts cannot employ the Civil Rights Act for the purpose of enjoining the assessment of state taxes and therefore cannot allow fees and costs in such an action under ง 1988 of that Act.
In State Tax Commission v. Fondren, 387 So.2d. 712 (Miss. Sup.Ct. 1980), plaintiffs challenged county tax assessments in a state court on the ground that the state tax commission had failed to equalize assessments among counties as required by state statutes and state and federal constitutions. Violations of the due process clause of the Fourteenth Amendment of the United States Constitution were asserted; section 1983, as well as the provisions of the Mississippi Constitution, were advanced as bases for granting relief. Plaintiffs were successful in obtaining an injunction and an allowance of counsel fees by the trial court. The Mississippi Supreme Court reversed. It found that the Mississippi statute provided plaintiffs with a "plain, speedy and efficient remedy" for tax relief, thus meeting the *458 conditions of the Tax Injunction Act. It then reasoned that, since the Tax Injunction Act denied sections 1983 and 1988 jurisdiction to the federal courts over plaintiffs' tax assessment claims, the state courts were deprived of that jurisdiction as well. It said:
We agree with complainants that state courts have jurisdiction of 1983 actions concurrent with federal courts, but of course, a state court entertaining a 1983 action has no more jurisdiction than a federal district court.
....
It is well established that generally it is not necessary to exhaust state remedies before seeking relief under section 1983. However, the exhaustion of state remedies rule is applicable in actions brought under section 1983 to enjoin, suspend or restrain the assessment, levy or collection of taxes because of 1341. [at 723.]
Fondren is not binding on this court and, for reasons set forth below, will not be followed.
The history of the Tax Injunction Act is instructive. It is discussed in Rosewell v. LaSalle Nat'l. Bank, 450 U.S. 503, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981):
The statute "has its roots in equity practice, in principles of federalism, and in recognition of the imperative need of State to administer its own fiscal operation." Tully v. Griffin, Inc. 429 U.S. 68 at 73, 97 S.Ct. [219] at 222 [50 L.Ed.2d 227 (1976)] [footnote omitted]. This last consideration was the principal motivating force behind the Act; this legislation was first and foremost a vehicle to limit drastically, federal district court jurisdiction to interfere with so important a local concern as the collection of taxes.
The Senate Report to the Act noted: "It is the common practice for statutes of the various States to forbid actions in State courts to enjoin the collection of State and county taxes unless the tax law is invalid or the property is exempt from taxation, and these statutes generally provide that taxpayers may contest their taxes only in refund actions after payment under protest. This type of State legislation makes it possible for the States and their various agencies to survive while long-drawn-out tax litigation is in progress." S.Rep. No. 1035, 75th Cong. 1st Sess. 1 (1937). [at 522-23, 101 S.Ct. at 1234.]
The Supreme Court also repeated the comments of Senator Bone, a leading supporter of the Tax Injunction Act, that the
... existing practice of the federal courts to entertain tax-injunction suits make[s] it possible for foreign corporations to withhold from a State and its governmental subdivisions taxes in such vast amounts and for such long periods as to disrupt State and county finances, and thus make it possible for *459 such corporations to determine for themselves the amount of taxes they will pay. [at 526, 101 S.Ct. at 1236.]
The Court also said: "Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts." Id. at 527, 101 S.Ct. at 1236.
There is nothing in the act or its history which indicates an intention to deny jurisdiction over civil rights claims to state courts in tax cases and no reason for such denial. The opposite inference is far more acceptable. It has long been recognized, as the Mississippi Supreme Court noted in Fondren, that state courts have concurrent jurisdiction with federal courts over civil rights actions. Endress v. Brookdale Community College, 144 N.J. Super. 109 (App.Div. 1976). The fact that Congress has deprived the federal courts of such jurisdiction in tax cases does not mean that state courts are so deprived as well. All federal courts are courts of limited jurisdiction. Nolan v. Otis Elevator Co., 560 F. Supp. 119 (D.N.J. 1982). That is not true of the Superior Court of New Jersey. N.J.Const. (1947), Art. VI, ง I, par. 1. Mississippi, of course, may limit the jurisdiction of its state courts, as it apparently has in Fondren; New Jersey has not done so and there is no reason that compels acceptance of the Fondren conclusion in this state. The interest of our courts is in the protection of the civil rights of our citizens, through enforcement of state and federal constitutions and civil rights statutes, not the opposite. Our Constitution requires the exercise of these concerns. N.J.Const. (1947), Art. VI, ง I, par. 1 provides:
The judicial power shall be vested in a Supreme Court, a Superior Court, County Courts and inferior courts of limited jurisdiction. The inferior courts and their jurisdiction may from time to time be established, altered or abolished by law.
Art. VI, ง III, par. 2 provides:
The Superior Court shall have original general jurisdiction throughout the State in all causes.
See Abbott v. Beth Israel Cemetary Ass'n. of Woodbridge, 13 N.J. 528 (1953).
*460 Application of the Fondren rule would mean that no taxpayer could avail herself of any remedy provided by the federal Civil Rights Act in a tax case, while state tax issues were being litigated, regardless of the presence of civil rights issues. She would be denied a forum in both state and federal courts for that purpose for an indefinite time, thus limiting enforcement of the Civil Rights Act. Congress, in adopting the Tax Injunction Act, could not have meant to prohibit such access to all courts.
There is an additional reason not to follow Fondren. The Tax Injunction Act does not apply unless the state provides taxpayers with a "plain, speedy and efficient remedy" regarding tax claims. That remedy is not provided in a state which prohibits joinder of state and federal claims. Rosewell makes this clear.
[I]t is the court's duty to withhold such relief when, as in the present case, it appears that the state legislature has provided that on payment of any challenged tax to the appropriate state officer, the taxpayer may maintain a suit to recover it back. In such a suit he may assert his federal rights and secure a review of them by this Court. This allows an adequate remedy to the taxpayer, and at the same time leaves undisturbed the state's administration of its taxes. [Rosewell, 450 U.S. at 513, 101 S.Ct. at 1229, quoting Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 300-301, 63 S.Ct. 1070, 1074, 87 L.Ed. 1407 (1943) and adding emphasis]
....
There is no doubt that the Illinois state-court refund procedure provides the taxpayer with a "full hearing and judicial determination" at which she may raise any and all constitutional objections to the tax....
Respondent does not allege any procedural defect in the Illinois remedy, other than delay, that would preclude preservation and consideration of her federal rights, since she is free to raise her equal protection and due process federal constitutional objections during the Application for Judgment proceedings before the Circuit Court of Cook County. [450 U.S. at 515, 101 S.Ct. at 1230; emphasis supplied; footnotes omitted.]
Justice Stevens, dissenting in Rosewell, quoted Matthews v. Rodgers, 284 U.S. 521, 525, 52 S.Ct. 217, 219, 76 L.Ed. 447 (1932):

*461 The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it. [450 U.S. at 531, 101 S.Ct. at 1238; emphasis supplied in Rosewell.]
He added:
[A]n inadequate state remedy is not analytically different from a state procedure that provides a remedy as to only a portion of the litigant's claims. Such an incomplete remedy will not defeat federal jurisdiction. [at 537, 101 S.Ct. at 1241.]
Rosewell was followed by Fair Assessment in Real Estate Ass'n. v. McNary, 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981). The United States Supreme Court in that case specifically noted the availability of a state court section 1983 remedy in discussing the adequacy of the Missouri taxing system. Id. at 116-117, 102 S.Ct. at 186.
A state court remedy, therefore, is not "plain, speedy and efficient" unless it provides an opportunity for the adjudication of federal civil rights claims involved with the tax issues during the course of the tax litigation. It may be pointed out that Fair Assessment does not say that state courts must entertain the civil rights claims simultaneously with the tax claims. Rosewell may be read as permitting the civil rights issues to be considered at the end of the tax litigation "during the application for Judgment proceedings." Rosewell, 450 U.S. at 515, 101 S.Ct. at 1230. That approach, however, would be entirely contrary to New Jersey's insistence upon procedural efficiency as a necessary route to just results. We do not merely permit the joinder of diverse claims, we demand it under the entire controversy doctrine, which requires all aspects of a controversy to be included in a law suit. Falcone v. Middlesex Co. Med. Soc., 47 N.J. 92 (1966); R. 4:27-1. The failure to join a relevant claim may constitute its abandonment. Id. No logic compels the separate consideration of tax claims and civil rights claims arising from the same factual setting. Nor does any decision of the United States Supreme Court or of our courts compel that approach in such cases. The Mississippi exhaustion rule *462 adopted in Fondren is not only contrary to New Jersey practice, it is also contrary to the rulings of the United States Supreme Court in Patsy v. Board of Regents of Florida, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), and Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). In those cases, the Court held that the exhaustion of state judicial and administrative remedies was not required in order to maintain a section 1983 suit. It follows that the plaintiffs' joinder of section 1983 claims with claims based upon state statutes and state decisional law was proper and that this court could have considered those claims simultaneously.

I. The Right to Recover Costs and Fees Despite The Court's Failure to Give Prior Consideration to the Civil Rights Claims

This court, in granting assessment relief, preferred to follow the path marked by N.J.S.A. 40:56-54 and our Supreme Court's decision in McNally. It did not address plaintiff's civil rights claims. The facts upon which relief was awarded, however, are the identical facts which supported those claims, claims which rested upon now proven unconstitutional assessments. The injunctive and declaratory relief, both prohibitory and mandatory, which plaintiffs obtained, while based upon state remedies, could as well have been based upon the Civil Rights Act. The result would have been no different. The successful pursuit of injunctive and declaratory relief in a section 1983 suit entitles the prevailing plaintiffs to an allowance of reasonable costs and counsel fees, whether or not damages are recovered. In Supreme Court of Va. v. Consumers Union, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), for example, they were allowed for services rendered in setting aside a rule adopted by the Virginia Supreme Court when that rule was held to be an unconstitutional exercise of administrative authority. The question, therefore, is whether the right to fees and costs, otherwise granted by the act, is to be denied because this court chose one path to decision when it could as *463 easily have chosen another. The question provides its own answer. The important right to recover the cost of successful litigation involving genuine issues of civil rights cannot be lost as a result of an unnecessary judicial election. The cases support this conclusion.
In Northcross v. Bd. of Ed. of Memphis City Schools, 611 F. 2d 624 (6th Cir.1979), the court discussed the purposes of section 1988. It said, referring to the legislative history contained in Senate Report No. 94-1011, reprinted in 1976 U.S. Code Cong. & Ad.News 5908:
Congress expressly commands the courts to use the broadest and most effective remedies available to them to achieve the goals of the civil rights laws. The Report comments that in accordance with the law established under the 1964 Civil Rights Act, the prevailing party should "ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." In accordance with the broad remedial purpose of the statute, parties may be considered to have prevailed when they have vindicated important rights through a consent judgment or without formally obtaining relief. [at 633.]
....
... So long as the party has prevailed on the case as a whole, the district courts are to allow compensation for the hours expended on unsuccessful research or litigation, unless the positions asserted are frivolous or in bad faith. There are numerous practical reasons why a court may not be permitted to dissect a law suit into "issues and parts of issues as to which the plaintiffs did not prevail," especially by decimating the total hours claimed with arbitrary percentages. [at 636.]
The present problem was addressed specifically in Kimbrough v. Arkansas Activities Assoc., 574 F.2d 423 (8th Cir.1978). There the court noted that section 1988 did not "squarely address the issue as to whether attorney's fees may be awarded when an action is brought under one of the enumerated sections [1981, 1982, 1983 & 1986] but is decided on a nonconstitutional ground." Id. at 426. It found, however, that a footnote to the report of the House Judiciary Committee accompanying the statute, H.R.Rep. No. 1558, 9th Cong., 2nd Sess. 4 n. 7 (1976), expressly approved the allowance of fees under such circumstances. The footnote provided:

*464 To the extent a plaintiff joins a claim under one of the statutes enumerated in [the Act] with a claim that does not allow attorney fees, that plaintiff, if it prevails on the non-fee claim, is entitled to a determination on the other claim for the purpose of awarding counsel fees. Morales v. Haines, 486 F.2d 880 (7th Cir.1973). In some instances, however, the claim with fees may involve a constitutional question which the courts are reluctant to resolve if the nonconstitutional claim is dispositive. Hagans v. Lavine, 415 U.S. 528 [94 S.Ct. 1372, 39 L.Ed.2d 577] (1974). In such cases, if the claim for which fees may be awarded meets the "substantiality" test, see Hagans v. Lavine, supra; United Mine Workers v. Gibbs, 383 U.S. 715 [86 S.Ct. 1130, 16 L.Ed.2d 218] (1966), attorneys' fees may be allowed even though the court declines to enter judgment for the plaintiff on that claim, so long as the plaintiff prevails on the non-fee claim arising out of a "common nucleus of operative fact". United Mine Workers v. Gibbs, supra. at 725 [86 S.Ct. 1130].
Further explaining the footnote, the court said:
The "substantiality" test to which the House Judiciary Committee refers is jurisdictional in nature. Before federal pendent jurisdiction can be exercised over a non-federal claim, the trial court must make the threshold determination that a substantial federal claim, arising from the same nucleus of operative fact, is raised by the allegations of the complaint. Without the existence of a substantial federal claim, no federal pendent jurisdiction over the non-federal claim exists. Since the District Court in the instant case invoked jurisdiction and disposed of the case on non-federal grounds, it implicitly made the initial determination that the allegations of the complaint raised a substantial constitutional claim sufficient to confer jurisdiction. We, therefore, conclude that the requirements for a discretionary award of attorney's fees as set forth by the House Judiciary Committee have been met.
The latest United States Supreme Court decision on the issue is Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), in which the Court held "result obtained" was the crucial factor in fixing fees, particularly where "a plaintiff is deemed `prevailing' even though he succeeded on only some of his claims for relief." Id., 103 S.Ct. at 1940. It added:
It may well be that cases involving unrelated claims are unlikely to arise with great frequency. Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.
Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably *465 expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. See Davis v. County of Los Angeles, 8 E.P.D. ถ 9444, at 5049 (CD Cal. 1974). Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters. [Id.; footnote omitted.]
See also, Seals v. Quarterly Cty. Ct., 562 F.2d 390, 393-94 (6th Cir.1977); Southeast Legal Defense Group v. Adams, 436 F. Supp. 891, 894-95 (D.Or. 1977); Bond v. Stanton, 555 F.2d 172, 174 (7th Cir.1977).
Our Supreme Court, citing Kimbrough, agrees. In Right to Choose v. Byrne, 91 N.J. 287 (1982), the Court said, in response to an argument that prevailing on a pendent state claim triggered section 1988:
The flaw in that contention is that section 1988 permits an award of counsel fees to a party who prevails on a state claim only when the federal claims are adjudicated favorably for that party or not adjudicated at all. Kimbrough v. Arkansas Activs. Ass'n., 574 F.2d. 423, 426 (8th Cir.1978). No counsel fees may be allowed where the federal claims have been decided adversely to "the prevailing party." [at 316; emphasis supplied.]
Later, in Singer v. State, 95 N.J. 487 (1984), the Court was more explicit:
While a plaintiff should recover for those hours reasonably related to or supportive of his successful claims, hours devoted to claims which are entirely distinct from the relevant successful claims should be excluded. However, if a plaintiff's unsuccessful claims are related to the successful claims, either by a "common core of facts" or "related legal theories" the court must consider the significance of the overall relief obtained to determine whether those hours devoted to the unsuccessful claims should be compensated. [at 500.]
Contra, Carmel v. Hillsdale, 178 N.J. Super. 185, 190 (App.Div. 1981).
Thus, the legislative and decisional history of section 1988 indicate that plaintiffs claiming bona fide civil rights violations, prevailing on alternative grounds, may recover fees and costs under section 1988, through a later determination of the constitutional claim for that purpose, if the constitutional claim "arises from the same nucleus of operative facts," or is "based upon related legal theories" and meets the "substantiality" *466 test. In the present case these conditions are satisfied. As determined in this opinion, plaintiffs proved a constitutional violation that would have entitled them to the relief awarded on other non-federal grounds had the court chosen to follow the constitutional route. The constitutional claims are clearly substantial. "The `substantiality' test merely requires ... that the constitutional (fee-claim) issue which is raised be not `wholly insubstantial, `obviously frivolous,' `plainly unsubstantial' or `obviously without merit.'" Southeast Legal Defense Group, 436 F. Supp. at 894. The claims arise from the "same nucleus of operative facts" as the state law claims upon which plaintiffs prevailed. Consequently, they are entitled to recover reasonable fees and costs pursuant to the provisions of section 1988.

J. Immunity

The Township argues that it is immune from any claim for fees and costs because its Council acted in a legislative capacity. Legislators are immune from liability for acts performed as legislators. Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). In Supreme Court of Virginia v. Consumers Union, the Court stated:
There is no ... indication in the legislative history of the Act to suggest that Congress intended to permit an award of attorneys' fees to be premised on acts for which defendants would enjoy absolute legislative immunity.... There is no indication that Congress intended to permit an award of attorneys' fees on acts that themselves would be insulated from even prospective relief. [446 U.S. at 738-39, 100 S.Ct. at 1978.]
In the present case, however, the Township's governing body acted in three capacities: legislative, executive and judicial. It has no immunity from liability with respect to its executive actions, Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), and no immunity from the imposition of costs and attorney's fees with respect to its judicial actions. Pulliam v. Allen, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984). The distinction between the functions is not always an easy one to make. See T & M Homes, Inc., v. Mansfield, 162 N.J. Super. 497, 509-13 (Law Div. 1978). *467 Here, however, when the governing body confirmed the assessments made by the Assessment Commission, the action was judicial; when it authorized the filing of the assessments in the tax office and the issuance of tax bills the action was executive. The real thrust of the suit was injunctive; plaintiffs sought restraints against future executive action enforcing the collection of the assessments. Plaintiffs who are successful in obtaining relief against future executive action, as here, are entitled to counsel fees and costs. Supreme Court of Virginia, 100 S.Ct. at 1977.

K. The Allowance of Attorney's Fees

Counsel, for the reasons set forth above, is entitled to an allowance of fees. There has been "a threshold showing by a prevailing plaintiff of not only a deprivation of a protectable right, but also of some action by defendant `under color of' state law that causes the deprivation of that right." Singer v. State, 95 N.J. 487, 492 (1984). The Singer approach to the calculation of the fees allowance is as follows:
Generally, a simpler and more straightforward approach in determining the reasonableness of attorneys' fees has evolved that has met with the approval of an apparent majority of jurisdictions. The most useful starting point for determining the amount of a reasonable fee, noted by the Supreme Court itself, Hensley v. Eckerhart, supra, 461 U.S. at 432, 103 S.Ct. at 1939, 76 L.Ed.2d at 50, is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This arithmetic result or "lodestar" may then be adjusted upward or downward to reflect any of those factors articulated in Johnson v. Georgia Highway Express, Inc., supra, and any other considerations that are deemed relevant by the court in the exercise of its sound discretion in light of the objectives of the Awards Act. Hughes v. Repko, 578 F.2d 483 (3d Cir.1978) (adjustments to amount of counsel fees may be made to reflect the quality of the attorney's work, the complexity of the issues presented and the contingent nature of success); see also Lindy Bros. Builders, Inc. v. American Radiator Standard Sanitary Corp., 487 F.2d 161 (3d Cir.1973) (Lindy I). Obviously, even under this approach, considerable discretion must be applied in determining both the reasonableness of the hours expended and the hourly billing rate. [at 499.]
Our Supreme Court, under vertical conflict of laws principles, will follow federal substantative law when the United States Supreme Court has decided the federal question. State v. *468 Coleman, 46 N.J. 16 (1965). The vertical choice of law rule is set forth in F. James & G. Hazard, Civil Procedure, ง 1.15, p. 39 (2d ed. 1977) [hereinafter James & Hazard]:
When a state court has before it a controversy governed by federal substantive law, the court is required to apply the federal law, under compulsion of the Supremacy Clause, Art. VI, cl. 2 of the Constitution.... Furthermore, in general, the state may employ its own procedural system in administering the federal law.
See Minneapolis & St. L.R. Co. v. Bombolis, 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916).
A request for the allowance of counsel fees normally raises procedural issues. Busik v. Levine, 63 N.J. 351, 372-73 (1973). However, the line that separates substance from procedure can be very indistinct. Id. at 364-65. It is not always wise to decide conflict of laws questions on the basis of a perceived distinction in a given case. The proper approach is to go "directly to the question whether the law of the forum should be applied with respect to each particular subject." Id. at 365; Restatement 2d, Conflict of Laws, (1971) comment b to ง 122, p. 352. Here, there are strong reasons not to apply the law of the forum. The request for attorney's fees is supported by the Awards Act, a federal statute. That statute was adopted to promote the enforcement of the Civil Rights Act, another federal statute. Both statutes are enforceable in the courts of this state by virtue of the Supremacy Clause of the United States Constitution. Ramirez v. Hudson County, 169 N.J. Super. at 457. The important connection between civil rights and the ability to enforce those rights by virtue of the Awards Act makes the counsel fee issue one of obvious substance, were that label of interest. Our Rules authorize the collection of counsel fees when "permitted by statute", R. 4:42-9(a)(8), thus attracting federal legislation in the present case. Singer relies in part on the decisions of federal courts in establishing its formula for the calculation of fees in a civil rights case. For all of these reasons, the conclusion that federal law, not state law, should apply becomes a necessity.
*469 The United States Supreme Court has addressed the counsel fee question in two recent cases, both of which, by reason of the above analysis, are binding, not only upon this court but also upon the New Jersey Supreme Court. State v. Coleman, 46 N.J. at 36. The first case is Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Hensley relied in part on the legislative history of section 1988 in which both houses of Congress accepted Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir.1974), as setting forth "appropriate standards" for fee awards. 461 U.S. at 430 n. 4, 103 S.Ct. at 1938, n. 4. Thus, in dealing with the present fee application, this court is obliged to read Singer in the light of Hensley, Johnson and legislative history. Singer has been modified by a second and later decision Blum v. Stenson, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Our Supreme Court has not had an opportunity to consider the implications of Blum.
Hensley, as recognized in Singer and confirmed by Blum, defined a "reasonable" attorney's fee as the "product of reasonable hours times a reasonable rate." 461 U.S. at 434, 103 S.Ct. at 1940. It also held that an enhanced award was justified "in some cases of exceptional success" and added that "the important factor of `results obtained'" was a consideration in deciding upon an upward or downward fee adjustment. Id. Hensley found that the standards listed in Johnson v. Georgia Hy. Express, 488 F.2d at 717-19, may be applied in calculating a reasonable fee by reason of the legislative history of section 1988. 461 U.S. at 428-32, 103 S.Ct. at 1937-39. The Johnson standards are:
(1) The time and labor required;
(2) The novelty and difficulty of the questions;
(3) The skill requisite to perform the legal service properly;
(4) The preclusion of other employment by the attorney due to acceptance of the case;
(5) The customary fee;
(6) Whether the fee is fixed or contingent;
(7) Time limitations imposed by the client or the circumstances;

*470 (8) The amount involved and the results obtained;
(9) The experience, reputation and ability of the attorneys;
(10) The "undesirability" of the case;
(11) The nature and length of the professional relationship with the client; and
(12) Awards in similar cases.
Hensley did not decide whether Johnson was to be considered in fixing the initial reasonable fee, or in fixing an enhanced fee, or both, although it is obviously to be interpreted as permitting the Johnson standard of "results obtained" to be considered when deciding an enhancement question. Blum also ignored this question but eliminated, as reasons for the allowance of an enhanced fee, experience, skill and quality of representation, except in rare cases, and, "normally," "results obtained", as well as complexity or novelty of issues, all of which were Johnson standards. Blum, 104 S.Ct. at 1549. Apparently, however, it permitted consideration of the risk of litigation (without deciding whether this included the risk of not prevailing) and the risk of nonpayment, for that purpose. Id. at 1550. "Risk" was not a Johnson standard. Singer addressed the enhancement question directly. It held, citing Hensley, that a reasonable fee is calculated by multiplying reasonable hours by a reasonable rate and that the "result or `lodestar' may then be adjusted upward or downward to reflect any of those factors articulated in Johnson. ..." Singer, 95 N.J. at 499. Our court also permitted the adjustment to reflect "any other considerations that are deemed relevant by the court in the exercise of its sound discretion in light of the objectives of the Awards Act." Id. The United States Supreme Court, as indicated, has not decided whether the Johnson standards, except those eliminated by Blum, are to be applied when considering an enhanced fee and has not limited that consideration to the remaining Johnson standards, although legislative history may indicate such limitation to have been intended. Furthermore, Blum seemingly authorized consideration of a standard not mentioned in Johnson: the standard of "risk." Consequently, the Singer rules have not been affected by Blum beyond the elimination of *471 the above-mentioned Johnson standards and Singer, to that extent, must be the focus of the present fee analysis. That analysis starts with the Hensley equation: reasonable hours X reasonable rates = reasonable fee.
Counsel has provided detailed records reflecting the amount of time spent in this litigation. That time includes services performed at the municipal level where hearings were held by the Assessment Commission and the governing body, the commencement and prosecution of the within litigation and the application for fees. The various phases of litigation must be addressed separately. Each involves different considerations.
Defendant objects to any allowance for services rendered at the municipal level, relying primarily upon the theory espoused by Webb v. Bd. of Ed. of Dyer County, Tenn., 715 F.2d 254 (6th Cir.1983). In that case the court pointed out that the administrative pursuit before the Board of Education was unnecessary because exhaustion of administrative remedies was not required in a civil rights action. Hours devoted to that pursuit were, therefore, not "reasonably expended" and fees for the local services should not be allowed. Other federal courts have adopted a contrary view and one which reflects the better approach in the present case. See DeMier v. Gondles, 676 F.2d 92 (4th Cir.1982); Ciechon v. Chicago, 686 F.2d 511 (7th Cir.1982); Chrapliwy v. Uniroyal, 670 F.2d 760 (7th Cir.1982); Bartholomew v. Watson, 665 F.2d 910 (9th Cir.1982), and Sullivan v. Comm. of Pa., Dept. of Labor, 663 F.2d 443 (3d Cir.1981).
Here, plaintiffs undertook extensive efforts at the municipal level to pursuade the Township that the assessments proposed by its expert, and eventually adopted, were wrong. The Township refused to adopt the opinions of the plaintiffs' experts and adopted assessments that eventually were set aside by this court. Had the Township done otherwise, there would have been no need for litigation and no application for costs and attorney's fees. Local proceedings in these matters should be *472 encouraged for these reasons. The failure to allow fees and costs to prevailing parties when those proceedings are challenged successfully will do the opposite. Property owners whose constitutional rights have been abused will ignore opportunities for relief provided by local tribunals, preferring litigation that provides the hope of recovering expenses. That route will lead to more expense, not less. Here, the in-court proceedings were based entirely upon the record made before the municipal agencies. Had the record not been made at that level, it would have been necessary to provide a like record through trial testimony in this court, a record likely to be more costly than that produced by the municipal proceedings. Further, since the record below formed the complete record for the in-court proceedings, it would be as unfair to disregard the attorneys' fees involved in making that record as it would be to disregard witness fees and transcript costs.
One of the claims advanced by the plaintiffs in the litigation was a claim for damages. That issue was briefed and argued but has never been determined. It has been agreed by the plaintiffs, perhaps because they do not foresee the recovery of substantial damages, that this claim will be waived if attorneys' fees are allowed. The defendant therefore argues that there should be no allowance for services rendered with respect to the damage claim. The waiver, however, does not prevent a fee allowance for time spent by counsel with respect to damage issues. The rule is set forth in Singer v. State (and repeated here for convenience) as follows:
While a plaintiff should recover for those hours reasonably related to or supportive of his successful claims, hours devoted to claims which are entirely distinct from the relevant successful claims should be excluded. However, if a plaintiff's unsuccessful claims are related to the successful claims, either by a "common core of facts" or "related legal theories" the court must consider the significance of the overall relief obtained to determine whether those hours devoted to the unsuccessful claims should be compensated. [95 N.J. at 500.]
Plaintiffs' damage claims have not necessarily been "unsuccessful." It is apparent, for example, that during this litigation plaintiffs have been subject to the threat that excessive assessment *473 liens would be imposed upon their properties. That threat may have affected sales and mortgage financing opportunities entitling plaintiffs to at least nominal damages. That circumstance, however, is not the point. The damage issue was one properly raised in connection with the constitutional claims and one which competent counsel should have raised since it could not be known, until the litigation concluded successfully, whether substantial damages may have been caused through some unforeseen event. The damage claims were merely another facet of relief based upon the "common core of facts" upon which successful claims were based. It was necessary to address them in the context of the entire litigation. Consequently, the hours spent by counsel in their pursuit should be compensated hours.
These dispositions of defense arguments permit the establishment of the "lodestar" referred to in Blum and Singer, the multiplication of hours reasonably expended by a reasonable hourly rate. The hours reasonably expended must be allocated to different areas of the litigation and are treated at the end of this section of the opinion. I conclude that the reasonable hourly rate is $90 per hour. "The rates to be applied should be those that would be charged by an adequately experienced attorney possessed of average skill and ordinary competence โ not those that would be set by the most successful or highly specialized attorney in the context of private practice." Singer, at 500. The $90 hourly fee is one suggested by plaintiffs' counsel and supported by the affidavits of other attorneys, who, in fact, support a higher figure. It is a figure that reflects the standards listed in Johnson. The instant proceedings were complex and sophisticated, requiring unusual diligence and considerable expertise. Plaintiffs' counsel is a specialized attorney who could be expected to charge a larger than ordinary fee for the conduct of such litigation. The $90 figure is one adequate to attract competent counsel without providing a windfall. I find it to be reasonable for section 1988 purposes. That rate multiplied by the number of hours reasonably expended *474 provides the "lodestar" to be adjusted upward or downward to reflect the relevant considerations set forth in Singer at 499, modified by Blum, and subject to the court's discretion.
The Singer court held that lodestar adjustments could be based upon the factors set forth in Johnson, 488 F.2d at 717-19. Those factors, reflecting the modifications required by Blum, are:
(1) The time and labor required;
(2) The novelty and difficulty of the questions (eliminated by Blum);
(3) The skill requisite to perform the legal service properly (eliminated by Blum except in rare cases);
(4) The preclusion of other employment by the attorney due to acceptance of the case;
(5) The customary fee;
(6) Whether the fee is fixed or contingent;
(7) Time limitations imposed by the client or the circumstances;
(8) The amount involved and the results obtained ("results" eliminated by Blum, "normally");
(9) The experience, reputation and ability of the attorneys (eliminated by Blum except in rare cases);
(10) The "undesirability" of the case;
(11) The nature and length of the professional relationship with the client; and
(12) Awards in similar cases.
Singer also permitted adjustments based upon "any other considerations that are deemed relevant by the court in the exercise of its sound discretion in light of the objectives of the Awards Act" 95 N.J. at 499, namely, provision for "`effective access to the judicial process' for citizens striving to vindicate their civil rights." H.R. Rep. No. 94-1558, 94th Cong., 2d Sess. 9 (1976). Id. at 497. However, Singer cautions the courts to "exercise a fine discretion dominated by equitable considerations, understanding `[t]here is no precise rule or formula for making these determinations' Hensley v. Eckerhart, supra 461 U.S. at 436, 103 S.Ct. at 1941, 76 L.Ed.2d at 52." [at 501.]
The assessment challenge mounted by plaintiffs' counsel was a difficult one. The number of properties involved was substantial. Analyzing and refuting the appraisal approaches used *475 by the municipality's expert was necessary and complex. Six experts were presented by plaintiffs for the purpose. The efforts of counsel at the municipal level established the record upon which the successful litigation was based. Those efforts were above the ordinary. Such is also the case when the litigation phase of the proceedings is addressed. At this level, counsel was obliged to deal not only with all of the arguments made before the muncipal agencies but, in addition, with all of the statutory and constitutional questions eventually resolved in favor of the plaintiffs. Two appeals had to be defended in order to reach that result. Extensive briefing and argument were necessary at the trial and Appellate Division levels. An application to the Supreme Court for certification had to be addressed. These circumstances invite an upward adjustment of the lodestar.
That adjustment is available for two reasons sanctioned by the Singer-Blum formulae: quality of representation and delayed payment of fees. Quality is a consideration "only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was `exceptional'" Blum, 465 U.S. at 899, 104 S.Ct. at 1549. Here, the affidavits of various attorneys provide the "specific evidence" that the fee suggested by plaintiffs' counsel for lodestar purposes is less than that reasonably to be expected in view of the superior quality of the services rendered. The delay in payment is an obvious factor. This litigation has been in progress for five years. Counsels' investment of time and overhead is very substantial. The value of the monies due for fees, based upon conservative interest rates, is at least 10% per annum. For these reasons an upward adjustment of the lodestar by a factor of 1.4 for municipal, trial and appellate services is required.
The final phase of this litigation is that devoted to the present application. There is no reason to deny fees in that *476 connection. The right to fees is an important right given to the plaintiffs by the Awards Act in order to encourage the enforcement of civil rights. Persons whose civil rights have been abused are entitled to be secure in the knowledge that they can recover attorneys' fees when they have mounted a successful challenge to constitutional violations. That security would not be provided if contested fee claims were not treated as part of the entire civil rights litigation. There is also no reason to deny a lodestar adjustment for these services, although the defendant argues to the contrary, citing several cases. Those cases do not support the argument. Baughman v. Wilson Freight Forwarding Co., 583 F.2d 1208 (3d Cir.1978), was a private anti-trust action. It held only that "the hours devoted to preparation of the fee petition should not be included in the lodestar amount for purposes of adjusting that amount for contingency or quality." Id. at 1219, emphasis supplied. One year after Baughman the Third Circuit decided Bagby v. Beal. 606 F.2d 411 (3d Cir.1979), in which it said that there could be an upward adjustment of fees involving a fee application if required when reviewed in light of the "substantive purposes" of the Civil Rights Act. See also, Vecchione v. Wohlgemuth, 481 F. Supp. 776 (E.D.Pa. 1979); Poston v. Fox, 577 F. Supp. 915 (D.N.J. 1984).
The fee application has involved difficult issues requiring extensive briefs and argument. There is, however, no specific showing that supports an upward adjustment of the lodestar. It cannot be said that the success in obtaining fees is "exceptional." A successful party "should ordinarily recover an attorneys' fee unless special circumstances would render such an award unjust." Newman v. Piggie Park Enterprises, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). Delay in recovering fees has been much less than is the case with other phases of the litigation. Under the circumstances, an upward fee adjustment is not appropriate for fee application services.

*477 L. The Allocation of Fees

Services of counsel are divided into five phases: municipal, trial court (assessment questions), Appellate Division, Supreme Court and trial court (fee question). The hours spent with respect to each phase, as set forth below, are found to be reasonable. The rates set forth reflect lodestar adjustments in accordance with this opinion. The total fees shown are those which would be awarded if there were no further considerations involving the fee issue. There are such considerations, however, and they lead to a different result. The analysis was made in order to discharge the obligation of a trial court to decide all issues, so that all aspects may be addressed by an appellate court in the event of an appeal.

Services Hours Rate Fee
Municipal 70.1 $126. $8,832.60
Trial Court 143.1 126. 18,030.60
Appellate Division 102.4 126. 12,902.40
Supreme Court 26.7 126. 3,364.20
Trial Court 36.0 90. 3,240.00
 __________
 $46,369.80
 ==========

The further consideration is that plaintiffs' counsel had a fee agreement with the plaintiffs. It would require their payment, for the hours of service accepted here as reasonable, of fees in the amount of $33,837, plus expenses. The municipality cannot be expected to pay for any more fees than counsels' clients would have to pay. Copeland v. Marshall, 641 F.2d 880, 891 (D.C. Cir.1980). The Johnson court suggested that limitation, saying:
In no event ... should the litigant be awarded a fee greater than he is contractually bound to pay, if indeed the attorneys have contracted as to amount. [488 F.2d at 718.]
Ordinary logic compels the same result. A court should not allow counsel fees in excess of those considered reasonable by counsel simply because they are now to be paid by an adversary instead of a client.

*478 M. Costs

The plaintiffs seek an award of costs, including the cost of three expert witnesses. These witnesses testified at municipal hearings prior to the institution of this litigation. Their testimony was not accepted at the municipal level. When this court rejected the original assessments and established new ones, however, it relied primarily on their opinions. Those opinions were contained in the record of the municipal proceedings; that record provided the basis for the decision here โ no trial was required. These circumstances permitted avoidance of a trial, a remand, another round of municipal hearings, new assessments, and the possibility of renewed litigation. Substantial costs were saved. This result would not have been possible without the expert testimony produced by the plaintiffs. It is also clear that such testimony was a necessity; its absence would have denied plaintiffs any chance of success. Experts' fees amounted to $5,658.42. The uncontradicted proofs show that the fees were reasonable. I conclude that they should be allowed.

(1) Rules and Statutes

R. 4:42-8(a) provides:
Unless otherwise provided by law, these rules or court order, costs shall be allowed as of course to the prevailing party. The action of the clerk in taxing costs is reviewable by the court on motion.
N.J.S.A. 2A:15-59 provides:
Except as otherwise provided by law, costs may be allowed or disallowed in the discretion of the court to any party in any action, motion, appeal or proceeding, whether or not he be successful therein; and where allowed they may be taxed according to law.[1]
N.J.S.A. 22A:2-8 provides:
A party to whom costs are awarded or allowed by law or otherwise in any action, motion or other proceeding, in the Law Division or Chancery Division of *479 the Superior Court is entitled to include in his bill of costs his necessary disbursements, as follows:
The legal fees of witnesses, including mileage for each attendance, masters, commissioners and other officers;
....
The costs of depositions, when taxable, by order of the court;
....
Such other reasonable and necessary expenses as are taxable according to the course and practice of the court or by express provision of law, or rule of court.[1]
Rule 54(d) of the Federal Rules of Civil Procedure provides:
Except where express provision therefor is made either in the statutes of the United States or in these rules, costs shall be awarded as of course to the prevailing party unless the court otherwise directs.... Costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.
42 U.S.C.A. ง 1988 provides:
In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fees as part of the costs.
28 U.S.C.A. ง 1920 permits the allowance of costs for:
(3) Fees and disbursements for printing and witnesses;
....
(6) Compensation of court appointed experts....

(2) New Jersey Cases

The question of the allowance of expert witness fees as costs in a civil rights action has not been considered by any New Jersey court. The usual approach to cost allowances is set forth in U.S. Pipe, etc. v. United Steelworkers of America, 37 N.J. 343 (1962):
Speaking first as to costs generally (apart from counsel fees), the amounts allowable in both trial and appellate courts are prescribed by statute, either expressly therein or as may be provided by court rule. N.J.S.A. 22A:2-2, 3, 5, 8, *480 9 & 10; R.R. 1:9-2 and 2:9-2. Such costs comprise principally certain statutory allowances, amounts paid to clerk in fees and various other specified disbursements of counsel including sheriff's fees, witness fees, deposition expenses and printing costs. Allowance is controlled by court rule and is ordinarily discretionary with the court in the particular case. See N.J.S.A. 2A:15-59.... In the trial divisions, costs are to be allowed as of course to any prevailing party "unless the court otherwise directs," "except when express provision therefor is made either in a statute or in these rules ...; R.R. 4:55-6(a). [at 355-356.]
This approach is to be coupled with the usual New Jersey philosophy that each litigant shall bear the expense of prosecuting and defending his individual interests. Sunset Beach Amusement Corp. v. Belk, 33 N.J. 162, 167 (1960). Nevertheless, in two cases, the Chancery Division and the Law Division have taxed the cost of depositions to a winning party. They found discretionary authority in N.J.S.A. 22A:2-8, which authorized (as it still does) taxation of "[t]he costs of taking depositions when taxable, by order of court." On the basis of this language, taxation of depositions costs against a losing party was permitted in a successful suit to set aside fraudulent conveyances, Finch, Pruyn & Co., Inc. v. Martinelli, 108 N.J. Super. 156 (Ch.Div. 1969), and in connection with a zoning challenge brought by an interested citizen, Huber v. Zoning Bd. of Adj. Howell Tp., 124 N.J. Super. 26 (Law Div. 1973). In the former case, the court said:
Costs normally are allowed as of course to a prevailing party, R. 4:42-8(a); however, their allowance is discretionary. In determining what costs may be allowed in the absence of specific authorization by Supreme Court rule, the court must find statutory authority. [108 N.J. Super. at 159.]
The concern about "statutory authority" has doubtful validity since the Rule would appear to be controlling. Busik v. Levine, 63 N.J. 351, 372-73 (1973); In re Caruso, 18 N.J. 26, 35 (1955).
A broader approach is reflected by In re Caruso. In that case the Court discussed the allowance of costs, including expert witness fees, to a losing party in a will contest. The then prevailing rule, R.R. 4:55-7(e), held to supersede the statute "in the exercise of the courts' rule-making power under the 1947 Constitution," at 35, permitted an allowance of counsel fees in a probate matter but was silent as to costs. A companion *481 rule, R.R. 4:55-6, provided essentially for the same allowances of costs to a "prevailing party" as our present rule, R. 4:42-8. The Court allowed the reasonable cost of producing expert opinion evidence. It said:
[E]xpenses necessarily incurred in the litigation of the issue of testamentary sufficiency have equal if not superior claim [to that for counsel fees] upon the estate where reasonable cause for the contest is shown. The one is not less compelling than the other. The question is left to sound judicial discretion, according to circumstances.

R.R. 4:55-6, the companion measure, provides, save where otherwise directed "either in a statute or in these rules" or where a wife does not prevail in a divorce, annulment, or maintenance action, for the taxation of costs as of course to "any prevailing party," including "disbursements" for the "attendance of witnesses," unless the court shall rule otherwise, subject to review by the court on motion. True, this rule relates only to the taxation of costs to the prevailing party; and "costs" have a statutory origin, directly or indirectly, being unknown to common law. "Costs" are said to be in the nature of incidental damages allowed to indemnify the successful party against the expense of vindicating a right invaded by the adverse party.
Such has been the rule at law inter partes, but in equity costs have always been allowable in the exercise of a sound discretion, according to the reason and justice of cause, not invariably following the outcome of the suit. And in probate proceedings costs "generally rest in the discretion of the court, and are often not allowed even to the prevailing party."
....
... where expert opinion evidence is essential to be resolution of the issue, a reasonable allowance for the service is includable in the taxed costs. [at 37-40; emphasis supplied; citations omitted.]
The present litigation is in the Law Division. However, that Division is authorized to apply equitable principles. N.J. Const. (1947) Art. 6, ง III, par. 4. This is not a probate proceeding, but the Caruso analysis need not be so restricted. It applies with equal force to the instant circumstances.

(3) The Federal Cases

A number of federal courts have addressed the expert witness fee question in civil rights matters, although the United States Supreme Court has not spoken. The United States Court of Appeals for the Third Circuit, in Roberts v. S.S. Kyriakoula D. Lemos, 651 F.2d 201 (3d Cir.1981), held that district courts have the discretion to award expert fees when *482 the testimony is "indispensable to the determination of the case." Id. at 206. It based this conclusion upon the theory that Federal Rule 54(d), as interpreted by the United States Supreme Court in Farmer v. Arabian American Oil Co., 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964), gives district courts discretionary authority to award costs when no statutory restriction exists. The federal statute, 28 U.S.C.A. ง 1920, allows fees for witnesses; it makes no express reference to expert witnesses. The Roberts court therefore allowed the expert fees. The language of 28 U.S.C.A. ง 1920 approximates N.J.S.A. 22A:2-8. Furthermore, Federal Rule 54(d) contains the identical provision found in New Jersey Rule 4:42-8, which allows costs to the "prevailing party."
In Jones v. Diamond, 636 F.2d 1364 (5th Cir.), cert. dism. sub. nom., Ledbetter v. Jones, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981), the court allowed expert fees and recognized a civil rights exception to the general rule precluding recovery of such fees as costs. In Cagle v. Cox, 87 F.R.D. 467 (E.D.Va. 1980), the court approved the taxation of an indigent plaintiff's expert witness fees against the losing party. It held this to be proper when: (1) the expert was necessary for the presentation of the claim or exceptional circumstances are present, (2) the party has made prior application to the court, and (3) the expense is reasonable. Id. at 471. In Quy v. Air America, Inc., 667 F.2d 1059 (D.C. Cir.1981), the court acknowledged that an expert's fees could be awarded when "the information or evidence [is] not otherwise reasonably accessible to the court and his appearance is determined to be critically important to the resolution of the case." Id. at 1066 n. 11. In Pennsylvania v. O'Neill, 431 F. Supp. 700 (E.D.Pa., 1977), the court allowed expert witness fees in a civil rights action, agreeing with the "many courts [which] have awarded experts' fees as costs where the experts' testimony was helpful to the Court and played an important role in the resolution of the issues." Id. at 713. The court, in Northcross v. Bd. of Ed. of Memphis City Schools, 611 F.2d 624 (6th Cir.1980), though not *483 dealing with expert fees, used language broad enough to permit their allowance pursuant to the provisions of ง 1988:
Some expenses are included in the concept of attorney's fees, as "incidental and necessary expenses incurred in furnishing effective and competent representation," and thus are authorized by section 1988. See remarks of Congressman Drinan, 122 Cong.Rec. H12160 (daily ed. 1 Ict. 1976) Beazer v. New York City Transit Authority, 558 F.2d 97 (2d Cir.1977), rev'd on other grounds, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). The authority granted in section 1988 to award a "reasonable attorney's fee" included the authority to award those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services. Reasonable photocopying, paralegal expenses, and travel and telephone costs are thus recoverable pursuant to the statutory authority of ง 1988. [at 639.]
Other federal courts disagree with Roberts. The United States Supreme Court refused to permit the taxation of expert witness fees in Henkel v. Chicago, Saint Paul, Minneapolis & Omaha R.R. Co., 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386 (1932) (not a civil rights case), a position apparently overruled by the Farmer decision. Such was the reading of Farmer by the Roberts court. In Illinois v. Sangamo Constr. Co., 657 F.2d 855 (7th Cir.1981), the court denied the taxation of expert witness fees. The same conclusion was reached in Huebschen v. Dept. of Health and Social Services, 547 F. Supp. 1168 (W.D.Wis. 1982) (testimony found to be not advisable or relevant). An analysis of the federal cases may be found in Expert Witness Fees โ A Recoverable Cost in Federal Court?, 1982 Ariz.St.L.J. 225. A listing of cases may be found in Taxation of Costs and Awards of Expenses in Federal Court, 101 F.R.D. 553, 581 (1984).

(4) Rationale

The plaintiff's application for an allowance of both costs and counsel fees in this matter is based upon the federal Civil Rights Act. This court has concurrent jurisdiction over suits brought under that Act. Peper v. Princeton U. Bd. of Trustees, 77 N.J. 55, 74 (1978). The Awards Act, ง 1988, as reflected by its history, supra, was designed to insure enforcement of the Civil Rights Act by citizens, who would be reluctant or unable to bring suits unless fees were recoverable. The arrangement *484 enabled the Federal Government to avoid financial and administrative enforcement burdens. Custom v. Quern, 482 F. Supp. 1000, 1003 (N.D., Ill. 1980); S.Rep. No. 94-1011, 94th Cong., 2d Sess. reprinted in 1976 U.S.Code Cong. & Ad. News 5908.
In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer. If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, these citizens must have the opportunity to recover what it costs them to vindicate their rights in court. [at 5910.]
Senator Tunney, a co-sponsor of the Act, pointed out that "if the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers. 122 Cong.Rec. 33,313 (1976). Congressman Drinan, House sponsor of the act, said that "the phrase `attorney's fee' would include the values of the legal services provided by counsel, including all incidental and necessary expenses incurred in furnishing effective and competent representation." Id. at 35,123. Thus, the philosophy of the act is advanced by the allowance of reasonable expert fees in civil rights cases.
This court, in the present phase of this case, is enforcing the federal Civil Rights Act. The lower federal courts are split over the issue of whether the successful plaintiff in a civil rights suit is entitled to recover the cost of expert testimony. The United States Supreme Court has not decided the questions. Those courts, such as the Roberts Court which allow recovery, advance the purpose of the Awards Act, i.e. encouraging enforcement of the Civil Rights Act by citizens, and therefore invite acceptance of their theories by state courts. None of these federal cases, however, turns on any interpretation of the Awards Act or the Civil Rights Act with the exception of Northcross, which did not specifically consider expert witness fees. All of them which allowed expert fees as costs did so by interpreting the federal costs statute, 42 U.S.C.A. ง 1920, in the light of the federal costs Rule 54(d), or by *485 finding inherent equitable power for the purpose. The allowances are discretionary. Consequently, there is no basis in federal case law for concluding that the Civil Rights Act or the Fees Act, either as a matter of substance or procedure, requires the allowance of expert witness fees to a successful civil rights litigant by a state court. Costs, like counsel fees, are generally considered to involve matters of procedure, not substance and are therefore controlled by state, not federal law, and, at least in New Jersey, by the Rules of the New Jersey Supreme Court. Busik v. Levine, 63 N.J. 351; In re Caruso, 18 N.J. 26. See, James and Hazard, supra. The correct rule, however, is one that ignores procedural-substantive labels and addresses the subject when deciding whether or not to apply the law of the forum. Thus, if the federal law on the question of expert witness fees were clear, it could well be the law to apply here. The reasoning of those federal courts which allow the recovery of such fees is highly appropriate in the present case. R. 4:42-8(a) provides that "costs shall be allowed as of course to the prevailing party." N.J.S.A. 2A:15-59 is more liberal, permitting an allowance even to an unsuccessful party. Expert fees are not mentioned specifically, but they are within the broad language of both rule and statute. They have been allowed in the only case addressing the question, In re Caruso, a case dealing with a costs Rule that contained language to the same effect as R. 4:42-8(a). While the demands of stare decisis may not bind this court to Caruso, its reasoning not only permits expert fees to be allowed as costs but also strongly persuades in that direction. That precedent, the language of our Rule and our statutes, the necessity for expert testimony and a concern for advancing the purposes of the federal Awards Act and the Civil Rights Act make the allowance of the requested expert fees in the present case entirely proper.
The use of expert witnesses was absolutely necessary. They were used at the municipal hearings, before this litigation commenced. Consequently, it was not possible to obtain prior court approval for fee allowances. Failure to allow this substantial costs would deprive the taxpayers of a significant part *486 of their victory and would discourage other taxpayers who find it necessary to challenge improper local improvement assessments. These are equitable considerations, which strongly favor the plaintiffs. Denial of an allowance for expert fees in the circumstances of this case would be an abuse of discretion.
There may be an additional reason for the allowance of the experts' fees. It has been held, in Federal Employer's Liability Act cases that federal standards may be applied when a state procedural rule unduly restricts a litigant's opportunity to assert a federal claim. Dice v. Akron C. & Y.R. Co., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952); Brown v. Western R., 338 U.S. 294, 70 S.Ct. 105, 94 L.Ed. 100 (1949). That appears to be the case here, if necessary experts' fees are denied. Consequently, a more liberal federal rule may be available.
Plaintiffs, in addition to experts' fees, seek an allowance for the cost of transcripts. There is express authority for this allowance. Finch, Pruyn & Co. Inc., v. Martinelli, 108 N.J. Super. at 159; Huber v. Zoning Bd. of Adj. Howell Twp., 124 N.J. Super. at 29. The broad language of our rule and statute also provide authority. The transcripts were the record in this case. The fact that they were available eliminated the need for a trial, additional expert testimony and considerable expense. Elementary fairness should permit recovery. The cost of transcripts will be allowed.

CONCLUSION
Judgment upon the present application is to be entered for:
A. Attorneys fees in the amount of $33,837.00.
B. Expert witness fees in the amount of $5,658.43.
C. The cost of transcripts in the amount of $2,129.50.
D. Usual costs to be taxed by the clerk, which shall include the additional sum of $287.31, being filing and like miscellaneous charges.
NOTES
[1] No explanation for the co-existence of these two costs statutes has been found. It may be that the second modifies the first but neither the language nor the history of either supplies that information.